**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 09-62020-CIV-ALTONAGA/Brown**

CX DIGITAL MEDIA, INC.,

      Plaintiff,

vs.

SMOKING EVERYWHERE, INC.,

      Defendant.

_____/

**ORDER SETTING FORTH FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

**THIS CASE** was tried to the Court over five days beginning January 18, 2011.  The Court

has carefully considered the testimony of the witnesses, the exhibits admitted in evidence, the

parties' written submissions, and the applicable law.  Based on its review of the record and pursuant

to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of fact and

conclusions of law.

**I.  FINDINGS OF FACT**

Defendant, Smoking Everywhere Inc. ("Smoking Everywhere"), sold through its website an

alternative to regular cigarettes called "electronic cigarettes," "E-Cigarettes," or "E-Cigs."[1]  (Trial

Tr. III 4:22–5:8 [ECF No. 55]).  To generate web traffic to its site and increase sales of E-Cigs,

Smoking Everywhere approached Plaintiff, CX Digital Media, Inc. ("CX Digital"), about a free-trial

offer that Smoking Everywhere wanted to promote.  (*See* Trial Tr. II 43:12 [ECF No. 54]).

_____

[1]  It was emphasized at trial and is therefore worth mentioning here that electronic cigarettes are not
"a smoking cessation device." (Trial Tr. III at 25:4–21).

Case No. 09-62020-CIV-ALTONAGA/Brown

CX Digital provides "advertising solutions" through "affiliate marketing." (Trial Tr. I 54:22–55:9 [ECF No. 53]). More simply put, CX Digital acts as a middleman between its network of affiliates or "third-party publishers," who purchase or provide advertising on the internet ("CX Affiliate[s]"),[2] and businesses that want to advertise online ("CX Client[s]").[3] (*Id.* 55:16–56:16). How this works in practice is a bit technical.

CX Digital has relationships with approximately 10,000 independent affiliates. (*See* Trial Tr. I at 55:6). These affiliates are typically small entrepreneurs who purchase advertising space on web sites, social media sites, or who do direct emailing. (*See id.* at 55:3–5, 57:1–3; Trial Tr. II at 44:2–4). When CX Digital enters an agreement called an "insertion order" with a new Client (*see* Trial Tr. I at 14:15–17), CX Digital may work with the Client to design a campaign and to design appropriate web pages for the campaign (*see id.* at 56:1–3).

CX Digital makes the Client's campaign available to CX Affiliates, who place advertisements for the CX Client's campaign. (*See id.* at 56:2–3). Each of the advertisements is clickable. When a consumer sees the ad, becomes interested in the product or service, and clicks on

---

[2] The parties' agreement permits "All forms of Email, Web/Banners, and Search," but prohibits "Incentivized or Freebie Traffic." (Trial Ex. 1 at 1).

[3] The terminology used at trial was inconsistent and confusing. For instance, the term "advertiser" was used to describe both CX Clients, who contracted to have their goods and services promoted by CX Digital, and the CX Affiliates, who ultimately placed the advertising content in emails or on web pages. Moreover, the terms "start page," "URL," "landing page," "confirmation page," and "thank-you page" were a significant source of confusion for counsel and the witnesses. The terms "sale," "action," and "lead," although purportedly synonymous, acquired and lost shades of meaning depending on who was talking.

In this Order, the Court has endeavored to be precise in its use of these terms where possible and to minimize its use of synonyms where one term would do. For example, the Court uses only the term "Sale" where the parties use "sale," "lead," "order," and "action" to refer to the firing of the CX Digital pixel on Smoking Everywhere's thank-you page. (*See* Insertion Order 1 [Agreed Trial Ex. 1]).

Case No. 09-62020-CIV-ALTONAGA/Brown

the advertisement, a process begins.  A small text file called a "cookie" is placed on the consumer's computer.  (*See* Trial Tr. I at 57:4–5).  The cookie contains information identifying the CX Client and the CX Affiliate who placed the advertisement, and identifies itself as a CX Digital cookie.  (*See* Trial Tr. I at 57:5–9).  The advertisement also contains a Uniform Resource Locator ("URL") or web address that briefly directs the consumer to CX Digital's server.  (*See* Trial Tr. I at 56:21–25, 106:15–20).

Upon arriving at the CX Digital server, CX Digital records which affiliate's advertisement was clicked on by the consumer.  (*See* Trial Tr. I at 57:5–9, 125:6–18).  The consumer is then redirected to the Client's "landing page,"[4] which contains the campaign offer details and a link to purchase the Client's product or service.  (*See* Trial Tr. I at 57:12–20, 125:16–17).  If the consumer decides to purchase the product, he or she places it in the "shopping cart" and then proceeds to a payment page.  (*Id.*).  On the payment page, the consumer enters credit-card information and clicks submit.  (*See id.*).  If the credit card is valid, the consumer reaches a confirmation or "thank-you" page.  (*Id.*).  The thank-you page contains one or more small pieces of code called "pixels"[5] which look at the consumer's computer to determine how the user arrived at the thank-you page.  (*Id.* at 61:11–24).  In the case of the CX Digital pixel, the pixel searches the consumer's computer for a

---

[4]  The landing page may allow the user a great deal of freedom to explore the Client's website and learn about the product.  It need not force the consumer to follow a straight path to purchasing the product or service.  (*See* Trial Tr. II at 26:8–24).

[5]  There need only be one thank-you page for any number of affiliates or affiliate marketing providers because all of them can place their pixel on the same page and get credit for their referrals.  (*See* Trial Tr. III 9:7–21 ("[W]e had one 'Thank you' page for all affiliates.").  *But see* Trial Tr. II at 88:5–89:5 (stating each landing page got its own thank-you page)).

Case No. 09-62020-CIV-ALTONAGA/Brown

cookie placed by one of its affiliates and, if it finds one, sends a message back to the CX Digital server confirming a completed Sale.[6]  (*Id.*).

The completion of a Sale triggers two obligations.  First, the Client owes CX Digital the unit price for a Sale, and second, CX Digital owes its referring affiliate a payment for a completed Sale. CX Digital pays its affiliates, usually on a weekly basis, even if it has not received payment from the Client.  (*See* Trial Tr. I at 65:14–17, 66:3–13).

On August 4, 2009, Nick Touris, the vice-president of advertising for Smoking Everywhere (*see* Trial. Tr. I 39:13–18), entered an agreement, entitled Insertion Order #6921, with CX Digital on behalf of Smoking Everywhere (*see* Insertion Order 1).  In the Insertion Order, Smoking Everywhere promised to pay $45.00 to CX Digital for each completed Sale of the "Gold E-Cigarette Kit Free-Trial."  (*Id.*).  The term "Sale" is defined by the Insertion Order as "a consumer who accesses the content via a CX Digital link and completes a one-page registration consisting of: filling in the appropriate field of information and successful credit card submi[ssion] . . . .  No further action will be required from the consumer for the [cost per action] to be payable."  (*Id.*).

During the month of August, CX Digital provided 670 Sales pursuant to the Insertion Order. (*See* Agreed Trial Ex. 2).  CX Digital never provided more than 200 Sales on any given day in August; from August 13, 2009 until August 31, 2009, the average number of Sales per day was about 39.  (*See* Pl.'s Trial Ex. 4; Trial Tr. I at 16:4–9).  CX Digital invoiced Smoking Everywhere $25,150.00 dollars for the 670 August Sales; the invoice reflected a $5,000 deduction for a deposit that Smoking Everywhere had already made.  (*See* Agreed Trial Ex. 2).  Payment for the August

---

[6]  The Insertion Order required Smoking Everywhere to place CX Digital's pixel on its thank-you page.  The pixel was to be used for all billing purposes.  (*See* Insertion Order 1).

Case No. 09-62020-CIV-ALTONAGA/Brown

invoice was due on September 15, 2009 (*see id.*); Smoking Everywhere has never paid that bill (*see* Trial Tr. I at 44:3–7).

On September 2, 2011, Touris and Pedram Soltani, an account manager at CX Digital, engaged in a day-long instant-message conversation covering a number of topics, including the operation of "two new pages," and whether CX Digital would rely on its "best affiliate [who is] . . . legit" to send "2000 orders/day by Friday." (Pl.'s Trial Ex. 2-2). The Court quotes at length from this conversation, which CX Digital contends memorializes a modification of the Insertion Order, because of its importance to the litigation and to preserve the context of the conversation.

The conversation began with a long, technical discussion about switching away from the ecig.smokingeverywhere.com link:

> pedramcx [Pedram Soltani] (10:22:00 AM): good morning Nick!
>
> pedramcx (10:22:23 AM): Have you placed the pixels for the two new pages?
>
> pedramcx (10:22:44 AM): if so, then I can switch the ecig.smokingeverywhere.com link
>
> pedramcx (10:22:48 AM): and we can do the test
>
> pedramcx (10:22:55 AM): for both campaigns
>
> nicktouris (10:38:28 AM) pedram are you in?
>
> pedramcx (10:38:33 AM): yes
>
> pedramcx (10:38:47 AM): just waiting for confirmation to switch the link
>
>         *        *        *
>
> nicktouris (10:38:55 AM): please send me both pixels and test links so we make sure we get this correct

-5-

Case No. 09-62020-CIV-ALTONAGA/Brown

pedramcx (10:38:47 AM): ok

(Pl.'s Trial Ex. 2-2). Touris had difficulty receiving the pixel by email, so Soltani sent it to him by

instant message, and then the conversation continued with Touris complaining:

nicktouris (11:22:06 AM): this test link goes to the old ecig page

http://www.incentaclick.com/click/xde15fb9fe/test_6609/

\*              \*              \*

pedramcx (11:24:23 AM): so are the pixels placed for both campaigns?

nicktouris (11:24:32 AM): yes

pedramcx (11:24:44 AM): ok...so now I'm quickly switching the link

pedramcx (11:24:54 AM): and then you can do the test for both

pedramcx (11:25:02 AM): do the test for the old page first

pedramcx (11:25:06 AM): because it's set live

nicktouris (11:26:20 AM): both pages tested

nicktouris (11:26:40 AM): the old page has not been touched

pedramcx (11:27:12 AM): the test has to be done again because I'm still using the

old link

pedramcx (11:27:22 AM): I wasn't going to use the new URL until you placed the

pixel

pedramcx (11:27:36 AM): I'm switching the link now, because the pixel is placed

nicktouris (11:27:45 AM): would you please give me a call

pedramcx (11:28:32 AM): yeah give me a sec

Case No. 09-62020-CIV-ALTONAGA/Brown

pedramcx (11:28:45 AM): I just switched the link for the old page to the new cxd2 page

pedramcx (11:28:49 AM): the test can be done now

pedramcx (11:29:30 AM): the test link showed up for the new non video page

pedramcx (11:29:34 AM): so we're good to go for that one

(*Id*.).

Touris and Soltani then discussed removing the 1-800 number from one of Smoking Everywhere's pages.  (*See id.*).  Soltani volunteered CX Digital to re-code some of Smoking Everywhere's pages and to send them back to Smoking Everywhere so that they could be uploaded. After those re-coded pages were running but "cut up" (*id.*), Touris told Soltani:

nicktouris (2:09:32 PM): http://www.incentaclick.com/click/mc973327df/test_6562/ is taking me to ecig

                    *              *              *

nicktouris (2:11:48 PM): when I type it in it take me to the old ecig page

pedramcx (2:12:04 PM): yeah...sorry give me a second

pedramcx (2:12:08 PM): I guess it didn't save it

pedramcx (2:12:14 PM): let me switch the link again

pedramcx (2:12:15 PM): one sec

pedramcx (2:13:07 PM): done

Case No. 09-62020-CIV-ALTONAGA/Brown

pedramcx (2:13:16 PM): send the tests

nicktouris (2:19:34 PM): sent

(*Id*.).

After the discussion about switching the links, Soltani began a conversation about increasing the number of Sales CX Digital was sending Smoking Everywhere:

pedramcx (2:49:45 PM): A few of our big guys are really excited about the new page and they're ready to run it

pedramcx (2:50:08 PM): We can do 2000 orders/day by Friday if I have your blessing

pedramcx (2:50:39 PM): You also have to find some way to get the Sub IDs working

pedramcx (2:52:13 PM): those 2000 leads are going to be generated by our best affiliate and he's legit

nicktouris is available (3:42:42 PM): I am away from my computer right now.

pedramcx (4:07:57 PM): And I want the AOR when we make your offer #1 on the network

nicktouris (4:43:09 PM): NO LIMIT

pedramcx (4:43:21 PM): awesome!

(*Id*.).

The same day as this conversation, the number of Sales per day that CX Digital sent to Smoking Everywhere began to increase substantially. (*See* Pl.'s Trial Ex. 4). Between September 2, 2009 and September 23, 2009, CX Digital sent an average of 1,244 Sales per day, with a peak of 2,896 Sales on September 22, 2009. (*See id*.).

Case No. 09-62020-CIV-ALTONAGA/Brown

On September 10, Touris exchanged emails with Soltani about "non compliant pages."

(Def.'s Trial Ex. 6-1). Touris complained that he had come across one site that had the wrong terms

and was "advertising [the offer] as FREE." (*Id*.). Touris specifically observed:

> I just noticed [the non-compliant page] has the old terms at the bottom of the page
> ...need updated terms below.
>
> http://cxd1.smokingeverywhere.com/terms.html

(*Id*.). Soltani acknowledged these complaints and responded by sending an email to CX-Digital

affiliate managers advising them

> [T]here is zero tolerance when it comes to promoting the E-cigs as a quit
> smoking/smoking cessation device or any allusion whatsoever to a quit smoking aid.
> The offer cannot be pushed as [sic] "Doctor" or "Medically" recommenced product
> either. Publishers caught doing this will receive an initial warning to make changes
> to their page and will be cut off from the offer if caught doing it again . . . . Have
> your guys promote the offer the same as on our landing page.

(Def.'s Trial Ex. 6-2).

CX Digital took Smoking Everywhere's free-trial offer off its network on September 23 or

24, 2009 because Smoking Everywhere had not paid the August invoice. (*See* Trial Tr. I at

182:4–15). On October 2, 2009, Soltani emailed Touris:

> As per our conversation, I just wanted to confirm that we will receive the wire for the
> outstanding balance owed to us by Monday, October 5, 2009. Once we receive the
> wire we will set the offer back live as everybody has been requesting it. Please
> confirm!

(Pl.'s Trial Ex. 5-3). Smoking Everywhere missed the October 5 payment deadline, and on October

7, 2009, Soltani again emailed Touris, seemingly in response to complaints about fraud, and

explained,

> There definitely isn't any incentivized traffic and the fraud has NOTHING to do with
> the nature of the page. The fraud simply comes from identity theft and fake

Case No. 09-62020-CIV-ALTONAGA/Brown

parameters being entered into the Smoking Everywhere landing page.  By having sub ids in place, you guys can see the pattern of which affiliates are sending the fraud. You must let us know within 4–5 days of the fraud occurrence so we can cut off that affiliate and do the chargeback for you guys.  As of the moment, it's way past that timeline and too late as we've paid our affiliates . . . . You guys need to wire us the money today so that we can turn the offer back live.

(Def.'s Trial Ex. 6-3).

At the end of September, CX Digital sent a second invoice for both August and September 2009.  (*See* Agreed Trial Ex. 2).  That invoice demanded that Smoking Everywhere pay a balance of $1,339,419.00 upon receipt.  (*See id.*).  That figure included a price increase from $45.00 to $51.00 per Sale for 17,294 Sales between September 14 and 23, 2009.[7]  (*See* Trial Tr. I at 23:19–20). CX Digital acknowledges that Smoking Everywhere paid a $5,000.00 deposit when it entered the Insertion Order.  (*See id.* at 185:7–8).  Accordingly, CX Digital asserts Smoking Everywhere owes it $1,260,805.00, which Smoking Everywhere has not yet paid.  The Complaint contains one count alleging breach of contract, and in addition to compensatory damages, seeks attorney's fees pursuant to the Insertion Order.

## II.  CONCLUSIONS OF LAW

As a preliminary matter, the Court notes the Insertion Order provides, and the parties agree, the interpretation of the Insertion Order is governed by the laws of the State of Delaware.  (*See* Trial Ex. 1 at 4; Trial Tr. I at 48:16–19).

---

[7]  CX Digital is not seeking to recover the additional $6.00 per Sale in this litigation.  (*See* Trial Tr. I at 23:19–20).

### A. The Insertion Order

Smoking Everywhere does not dispute it signed the Insertion Order and that the Insertion Order constitutes a valid contract between CX Digital and Smoking Everywhere. (*See* Trial Tr. III 31:9–11) (Plaintiff's Counsel: "You admit that Smoking Everywhere entered into a valid contract with CX Digital. Correct?" Elicko Taieb: "That's Correct."); *see also* Trial Tr. III at 5:12–13).

As will be discussed below regarding the alleged instant-message modification of the Insertion Order, Defendants contend they should not have to pay under the Insertion Order because: (1) CX Digital breached the Insertion Order by sending more than 200 Sales per day, (2) CX Digital breached the Insertion Order by sending traffic to URLs other than those listed on the Insertion Order, (3) much of the traffic was generated by misleading ads placed by CX Affiliates, and (4) many of the Sales supplied by CX Affiliates used fraudulent credit cards. However, none of these arguments apply to the August invoice.

First, there is no dispute that CX Digital performed its obligations under the Insertion Order during the month of August by providing fewer than 200 Sales per day. (*See* Pl.'s Trial Ex. 4; Trial Tr. I at 4–11). Second, there is no dispute that all of the traffic CX Digital sent to Smoking Everywhere in August was directed to the URLs listed in the Insertion Order; the president of Smoking Everywhere, Elicko Taieb, conceded this. (*See* Trial Tr. III at 72:20–73:23 ("I think they did it — I believe from checking afterwards that they did it for the first month and they didn't do it for the second month.")). Third, there is no evidence in the record that any of 670 Sales sent by CX Affiliates during August were procured through misleading or false information in the affiliates' ads, or that any of the August Sales were fraudulent.

Case No. 09-62020-CIV-ALTONAGA/Brown

Smoking Everywhere appears to be refusing to pay the August invoice because Smoking Everywhere has not received an itemized bill that would allow it to check to see if there were misleading ads or there was fraud. (*See* Trial Tr. III 33:25–34:8). However, on this point the Insertion Order provides,

> If any certain downstream [CX] affiliate violates the terms and conditions of [Smoking Everywhere] — and [Smoking Everywhere] can provide documentation to Company proving fraud beyond a reasonable doubt with a maximum of five (5) days the lead/sale or any other CPA violation then [Smoking Everywhere] will not be responsible for paying monies owed for the traffic and fraudulent [sales] general by that certain [CX] affiliate . . . Time shall be of the essence.

(Insertion Order ¶ 17). As stated, there is no evidence of any misleading advertisement causing a Sale or any fraudulent Sale generated by CX Affiliates during August 2009 in the record — much less anything of the specificity required under the Insertion Order. Smoking Everywhere's belated desire to scrutinize the Sales generated by individual CX Affiliates so that it can search for evidence of Sales attributable to misleading ads or fraud does not excuse it from paying what it owes for the Sales generated by CX Affiliates in August 2009. Accordingly, Smoking Everywhere is liable for the full amount due under the August invoice.

Smoking Everywhere also contends that, beginning in early September, CX Digital breached the Insertion Order by sending more than 200 Sales per day and by sending those Sales to the wrong landing page URLs. CX Digital does not dispute it engaged in this conduct, but it argues it was performing in accordance with the modified Insertion Order. Because Smoking Everywhere's allegations of breach by CX Digital turn on whether there was an enforceable modification to the Insertion Order, these arguments are addressed below in the discussion of the alleged changes.

-12-

Case No. 09-62020-CIV-ALTONAGA/Brown

**B.  Modification of the Insertion Order**

The central dispute in this case is whether the Insertion Order was modified to permit an unlimited number of leads to be sent to two new URLs that were different from the URLs listed in the Insertion Order.  This raises two questions: (1) did Touris and Soltani agree to modify the Insertion Order during their September 2, 2009 instant-message conversation; and if so, (2) is their agreement to modify the contract enforceable?

**1.      Agreement to Modify Insertion Order**

CX Digital contends the September 2, 2009 instant-message conversation between Touris and Soltani modified two aspects of the Insertion Order.  According to CX Digital, it (a) changed the URLs to which CX Digital was supposed to send traffic, and (b) it eliminated the 200-Sale-per-day limit.

"The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act."  RESTATEMENT (SECOND) CONTRACTS § 19 (1981).  Under Delaware law, "overt manifestation of assent — not subjective intent — controls the formation of a contract; [and] the 'only intent of the parties to a contract which is essential is an intent to say the words or do the acts which constitute their manifestation of assent'; . . . 'the intention to accept is unimportant except as manifested.'" *Indus. Am., Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del. 1971) (quoting RESTATEMENT § 20).

**a.      Change of Target URLs for CX Digital Affiliate Traffic**

In the "Campaign Details" section on the first page of the Insertion Order, the term "URL" appears in bold type followed by two internet addresses for Smoking Everywhere landing pages: http://ecig.smokingeverywhere.com and http://special.smokingeverywhere.com. (Agreed Trial Ex.

-13-

Case No. 09-62020-CIV-ALTONAGA/Brown

1).  CX Digital contends Touris and Soltani agreed to change the URL term during their September 2, 2009 instant-message conversation and to send CX Affiliate traffic to two new landing pages: cxd1.smokingeverywhere.com and cxd2.smokingeverywhere.com.  (*Cf.* Trial Tr. II 59:25–60:1; *see also* Pl.'s Trial Ex. 2-2 ("[Soltani]: I just switched the link for the old page to the new cxd2 page.")).

A close reading of the instant messages and careful consideration of the behavior of the parties during the conversation indicate clear assent on the part of both parties to stop sending traffic to the "old" ecig link and to begin sending the traffic to the two new URLs.  Soltani asks Touris, "Have you placed the pixels for the *two* new pages?"  Soltani adds, "if so, then I can switch the ecig.smokingeverywhere.com link . . . and we can do the test . . . for *both* campaigns."  (Pl.'s Trial Ex. 2-2) (emphasis added).  Apparently, Touris had not yet received the new pixels Soltani was referring to, so Touris asks, "please send me *both* pixels and test *links* so we make sure we get this correct."  (*Id.*) (emphasis added).  Soltani complies by sending the pixels by instant message.[8]

After receiving the pixel files by instant message, Touris places the two new pixels so that CX Digital can track Sales on the new pages, and Soltani then says "ok...so now I'm quickly switching the link."  (*Id.*).  This switch has to be repeated several times before it works properly.  (*See id.*).  During the process, Touris twice observes that the test links lead to the "old page" which

_____

[8]  The instant-message application recorded the file transfer in this way:

ATTENTION (10:57:56): Transfer Complete: Pixel and Test- Non Video Page-cxd1.txt

ATTENTION (10:58:02): Transfer Complete: Pixel and Test- Video Page-cxd2.txt

(*Id.*).  The Court notes that the tracking pixels' filenames contain "cxd1" and "cxd2;" these pixel names are consistent with the new "cxd1" and "cxd2" URLs that CX Digital contends it was supposed to, and did, send traffic to under the modification to the Insertion Order.  This is additional evidence suggesting there was an agreement between Touris and Soltani to redirect traffic to the new cxd URLs.

-14-

"has not been touched," and shortly thereafter complains another test link also takes him to "ecig." (*Id.*). Soltani responds to each of these complaints by switching the link again. (*See id.*). These actions do not make any sense unless the parties had agreed to switch the URLs to which CX Affiliate traffic was being directed. Moreover, Touris and Soltani ran tests on the new links and pixels to make sure the new pixels fired and notified CX Digital of the test Sales, which confirms that the links were to be used for CX Affiliate traffic.[9] (*See id.*).

Beginning the day of the instant-message conversation and continuing until CX Digital terminated the Insertion Order for non-payment, CX Digital sent all of its affiliate traffic to the cxd1 and cxd2 URLs (*see* Trial Tr. I at 45:13–21); Smoking Everywhere never complained (*see id.* at 72:13–19). The Court acknowledges that Smoking Everywhere maintains it was unaware CX Digital was sending traffic to the new URLs[10] (*see* Trial Tr. II at 52:1–7; Trial Tr. III at 68:2–8; *but see* Trial

---

[9] Touris admitted that CX Digital would not get credit for a Sale if it sent customers to the wrong URL. (*See* Trial Tr. II at 90:12–18).

[10] Smoking Everywhere emphasized at trial that the specific URLs CX Digital sent traffic to were important because Smoking Everywhere used these for some kind of tracking purpose. (*See* Trial Tr. II at 90:24–91:1; Trial Tr. III at 7:20–23). Just how Smoking Everywhere's tracking system worked or what it actually tracked was neither clear to the Court nor to Smoking Everywhere. (*See id.* at 86:1–91:14).

As best the Court can gather, Smoking Everywhere would count the number of Sales it processed on its thank-you page and compare that to the number of hits on a particular landing page and then assume, but not verify, that all of those hits came from a particular source, like CX Digital's affiliate network. However, this system would only reveal the conversion rate — i.e., the percentage of hits on the landing page that became Sales and would only work if there was a unique thank-you page for every landing page. (*See* Trial Tr. II at 87:2–88:11). But that was not the case: "[W]e had one 'Thank you' page for all affiliates, . . . for everybody. We did not build different 'Thank you' page . . . . So no matter for what landing page you come, you always gonna end up in the same 'Thank you' page after you process the credit card and get approved." (Trial Tr. III at 9:15–21; *but see* Trial Tr. II at 88:5–8 ("Q. So, in other words, you had a specific 'Thank you' page also . . . [f]or each?  A. Correct.")).

This system could not provide any information about fraud or misleading advertising that Smoking Everywhere could use to dispute the number of Sales CX Digital generated under the Insertion Order (*see* Trial Tr. III at 44:17–46:9, 47:22–48:20), and so even if CX Digital had sent the September affiliate traffic

Case No. 09-62020-CIV-ALTONAGA/Brown

Tr. 125:8–10 ("We had discussed Pedram at one point switching pages out, . . . and a couple of proposed pages were the CXD, CXD1, I think, and CXD2.")), but this is belied by the instant-message conversation between Touris and Soltani and is further undermined by an email sent by Touris on September 10, 2009.  (*See* Def.'s Trial Ex. 6-1).  In that email, Touris tells Soltani a CX Affiliate should update his ad to contain the terms located at "http://cxd1. smokingeverywhere.com/terms."  (*Id.*).

Moreover, during the early part of September, Touris was monitoring the content of CX Affiliate ads by reading and clicking on them; at that time, because all the CX Digital traffic was being directed to the new "cxd" pages, he would have been able to see that the CX Affiliate traffic was directed to those pages and not to the URLs on the Insertion Order.  (*See* Trial Tr. II at 97:2–98:10).  Touris's words and actions during the September 2nd instant messages with Soltani indicating CX Digital should send its affiliate traffic to the cxd URLs demonstrate an overt manifestation of assent on the part of Smoking Everywhere to modify the Insertion Order to permit the web traffic to be directed to the cxd URLs.[11]  Therefore, Touris agreed on behalf of Smoking Everywhere to modify the URL term of the Insertion Order.[12]

---

to the original URLs, Smoking Everywhere would have had no additional information relevant to the enforcement of the Insertion Order.  Moreover, this argument is irrelevant because it is clear that Touris assented to the modification of the Insertion Order by agreeing and cooperating with Soltani to switch from the "old ecig" URL to the new cxd URLs.

[11]  To the extent it is unclear when precisely the agreement between the parties was formed, "[a] manifestation of mutual assent may be made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined."  RESTATEMENT § 22.

[12]  Touris's authority to bind Smoking Everywhere is discussed below.

-16-

Case No. 09-62020-CIV-ALTONAGA/Brown

### b.    Removal of the Limit on the Number of Sales Per Day

In the "Campaign Details" section on the first page of the Insertion Order, the term "VOLUME:" appears in bold type followed by "200 leads/day." (Agreed Trial Ex. 1). CX Digital contends Touris and Soltani agreed to remove the limit on the number of leads or Sales per day during their September 2, 2009 instant-message conversation.

After the discussion between Touris and Soltani about switching the URLs, Soltani sends an offer to Touris: "We can do 2000 orders/day by Friday if I have your blessing . . . . [a]nd I want the AOR when we make your offer number one on the network." (Pl.'s Trial Ex. 5-2). Touris responds, "NO LIMIT." (*Id.*). CX Digital argues that Touris accepted Soltani's offer by saying "NO LIMIT." The Court agrees a contract was formed but clarifies that Touris's response acted as a rejection and counter-offer that Soltani accepted by then replying "awesome!" (*Id.*).

"In order to constitute an 'acceptance,' a response to an offer must be on identical terms as the offer and must be unconditional." *PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.*, 857 A.2d 998, 1015 (Del. Ch. 2004) (citing *Friel v. Jones*, 206 A.2d 232, 233 (Del. Ch. 1964); RESTATEMENT § 58). "A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer." RESTATEMENT § 59; *see also PAMI-LEMB I*, 857 A.2d at 1015 n.80. "The words and conduct of the response are to be interpreted in light of all the circumstances." *PAMI-LEMB I*, 857 A.2d at 1015 n.81 (citing RESTATEMENT § 202).

Here, Touris's response of "NO LIMIT" varies from the two specific terms Soltani offered and so acts as a counter-offer. Soltani proposed CX Digital provide 2,000 Sales per day and that CX Digital be the AOR or agent of record (*see* Pl.'s Trial Ex. 5-2), a term of art meaning the

-17-

exclusive provider of affiliate advertising on the advertising campaign. (*See* Trial Tr. II at 119:25–120:9). Touris makes a simple counter-offer that there be no limit on the number of Sales per day that CX Digital's affiliates may generate (*see* Pl.'s Trial Ex. 5-2) and makes no mention of the AOR term. Soltani enthusiastically accepts the counter-offer by writing, "awesome!"[13] (*id.*) and by beginning to perform immediately by increasing the volume of Sales (*see* Pl.'s Trial Ex. 4).

Touris testified he could have been responding to something other than Soltani's offer of 2,000 Sales per day when he said "NO LIMIT." (*See* Trial Tr. II at 118:20–25). Touris acknowledged that he had engaged in contract negotiations about "changing the number of leads, changing URLs, deposits, that type of thing" (Mar. 8 Trial Tr.[14] at 11:3–5), although he added, "we mainly spoke on the phone. A little bit of email but I had trouble receiving his emails so I mean we used Instant Messaging but you know there was a lot more than what was presented here, last court appearance." (*Id.* at 12:13–16). The implication of this testimony was that Touris could have been responding to something else he and Soltani had discussed by phone. But when pressed on just what else he could have been referring to when he said "NO LIMIT," Touris's memory failed him.

---

[13] As discussed in more detail below, after this modification, there are days when CX Digital sends well over 2,000 leads per day, which suggests it also understood the modification of the Insertion Order to be to eliminate the limit rather than to raise it to 2,000 per day.

[14] Citations to days three and four of the trial, which occurred on February 16, 2011 and March 8, 2011, are to the unofficial transcript because neither party has requested the preparation of an official version.

In particular, he denied that "NO LIMIT" was some kind of personal motto.[15]  (*See* Trial Tr. II at 119:6–7).

Indeed, neither Touris nor Taieb ever suggested any plausible alternative interpretation for why Touris wrote "NO LIMIT" to Soltani, nor did they explain the content of the alleged additional negotiations that took place outside of the September 2, 2009 instant messages or what effect those would have had on the apparent agreement the parties reached on September 2nd.  Considering Touris's admission that he was engaged in instant-message negotiations with Soltani about changing the number of leads along with the September 2nd instant-message transcript, directs the conclusion that those negotiations, wherever and however they occurred, culminated with a modification of the Insertion Order when Touris and Soltani agreed to "NO LIMIT."

Smoking Everywhere also observes that a significant amount of time — almost two hours — passed between Soltani's offer of 2,000 Sales per day and Touris's counter-offer of "NO LIMIT," which it suggests adds uncertainty to the meaning of the conversation.  (*See* Trial Tr. II at 133:17–134:10).  However, more than an hour passes before Soltani added that he would like CX Digital to be the AOR; yet this is clearly part of Soltani's offer.  It is then only thirty-four minutes later that Touris responds "NO LIMIT."  Given that Touris testified he would not have approved such an increase without first discussing it with Taieb (*see, e.g.*, Mar. 8 Trial Tr. at 9:12–16), one

---

[15]  It is clear from Soltani's "awesome!" reply that Soltani interpreted Touris's statement as a direct response to the offer to increase the number of Sales.  Moreover, Touris does not react to or correct Soltani's exclamation of "awesome!" in any way that would indicate confusion about the subject matter of their discussion.  Indeed, the conversation reads most naturally when understood as two people negotiating and reaching a modification of an existing agreement.

Case No. 09-62020-CIV-ALTONAGA/Brown

explanation for the time delay, if one is needed, is that Touris was doing just that — asking Taieb for approval.[16]

### 2.    Enforceability of the Modifications

Smoking Everywhere contends that even if it and CX Digital agreed to modify the Insertion Order, the modification is not enforceable for several reasons.  First, an oral modification of a contract must be proven with "specificity and directness."  (Def.'s Proposed Order ¶ 114 [ECF No. 61]).  Second, the language of the Insertion Order provides that it "may be changed only by a subsequent writing signed by both parties" (Insertion Order ¶ 16), and Smoking Everywhere did not waive this provision.  (Def.'s Proposed Order ¶¶ 119–120).  Third, "the Defendant did not give the required consideration for any modifications to the initial insertion order, thus the alleged changes to the insertion order are not enforceable." (*Id.* ¶ 137).  Fourth, Touris lacked the authority to bind Smoking Everywhere.  (*See id.* ¶¶ 145).  Lastly, Smoking Everywhere also raises the defenses of commercial frustration, violation of the implied covenant of good faith and fair dealing, and mutual mistake.  These defenses are addressed in turn.

### a.    Specificity and Directness

Drawing from Delaware case law, Smoking Everywhere contends "[a] party asserting an oral modification must prove the intended change with 'specificity and directness as to leave no doubt of the intention of the parties to change what they previously solemnized by formal document.'" *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1230 (Del. Ch. 2000) (quoting *Reeder v. Sanford School, Inc.*, 397 A.2d 139, 141 (Del. 1979)).  In particular, Smoking Everywhere

---

[16] Moreover, anyone who has used an instant-message application in an office setting will recognize these time lags between responses as typical of the medium.

Case No. 09-62020-CIV-ALTONAGA/Brown

relies on *Reserves Dev. LLC v. Severn Sav. Bank, FSB*, No. 2502-VCP, 2007 WL 4054231, at *10 (Del. Ch. Nov. 9, 2007). The court in that case found a series of emails in the "record [was] not sufficiently 'specific and direct' to support a conclusion that the parties orally modified an existing written contract."[17] *Id.* Smoking Everywhere contends that in this case, the instant messages between Touris and Soltani are not specific and direct enough evidence that it agreed with CX Digital to modify the Insertion Order. (*See* Def.'s Proposed Order ¶ 118). This argument resembles the formation arguments discussed above, and as stated there, when the parties' statements and conduct are considered, the parties' intent to modify the Insertion Order to change target URLs and to remove the limit on the number of Sales is clear, specific, and direct.

With respect to the agreement to change URLs, the instant messages not only contain statements indicating the parties had agreed to switch from the old ecig link to the new cxd links, but actually record the parties' efforts to switch the links as they go through that technical process. (*See, e.g.*, Agreed Trial Ex. 2-2 ("[Soltani: I'm switching the link now, because the pixel is placed . . . . I just switched the link for the old page to the new cxd2 page . . . . the test can be done now . . . . the test link showed up for the new non video page.")). It is difficult to imagine more specific and direct evidence of an agreement than the two parties actually sitting down simultaneously and doing what they had agreed to do. Therefore, the modification of the target URLs in the Insertion Order is supported by specific and direct evidence.

The agreement to modify the Insertion Order to remove the limit is also supported by specific and direct evidence. As discussed, during the September 2nd instant messages, Touris

---

[17] The court immediately added, "however, it does provide an adequate basis, when considered in the context of the parties' subsequent conduct, to support a claim for equitable estoppel." *Severn Sav.. Bank*, 2007 WL 4054231, at *10.

made a counter-offer of "NO LIMIT" in response to Soltani's offer of 2,000 leads per day with AOR status for CX Digital. Soltani accepted the counter-offer. This modification clearly changed the "VOLUME" term in the details contract of the Insertion Order from 200 per day to unlimited. The language in the instant messages and the increase in the volume of leads that immediately follows provide specific and direct support that the change was intended.

Moreover, the *Severn Savings* case is easily distinguished from this case. The court there held "the evidence fails to indicate directly and specifically the intended terms of the purported oral modification of the PSA to change the party responsible for effectuating construction of the infrastructure." *Severn Sav. Bank, FSB*, 2007 WL 4054231, at *10. This quote reveals two major differences from the modification in this case.

First, the scope and complexity of the modifications alleged in *Severn Savings* far exceed the narrow and straightforward changes here. In *Severn Savings* the alleged modifications were, very generally, that "Reserves [be substituted for] Bella Via as the party responsible for arranging construction of the infrastructure," and "Reserves [be substituted] for Bella Via as an intended beneficiary of the Construction Trust Agreement." *Id.* at *9. The emails in *Severn Savings* showed the parties discussing potential payment arrangements on two letters of credit, but evidence of an agreement "to change the party responsible for effectuating construction of the infrastructure" was only "sketchy" and "muddled." *Id.* at *9–10. Reading the emails excerpted in *Severn Savings*, one has the impression that the parties had discussed different options orally, but never reached any agreement. The emails were a continuation of the oral negotiations that tried to pin down the details of the parties' obligations. In this case, although there may have been conversations by phone, once the parties agreed to switch the URLs, they did so; and once the limit was removed on the number

Case No. 09-62020-CIV-ALTONAGA/Brown

of Sales per day, CX Digital began to send more — no further negotiation was needed.  The instant messages therefore, rather than showing continued debate like the emails in *Severn Savings*, show the parties had come to an agreement.

Second, the emails in *Severn Savings* were provided as evidence of an *oral* modification that had specific terms, not as a record of those specific terms.[18]  Here, the instant messages operate collectively as an unsigned writing containing the terms of the agreement to modify the Insertion Order.  CX Digital is not alleging there are additional oral terms to the modification that are not evident from the instant messages.  In fact, unlike in *Severn Savings*, Smoking Everywhere and CX Digital do not argue about what the specific terms of the alleged modification are, but about whether the modification actually occurred.  *See Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1230 (Del. Ch. 2000) ("The parties in this case argue over the very existence of the oral modification of the Agreement, not the certainty or ambiguity of its terms.").  As already discussed, the instant-message conversation and the parties' conduct surrounding it provide specific and direct evidence the parties agreed to modify the Insertion Order.

> **b.     The Signed-Writing Clause**

The Insertion Order provides it "may be changed only by a subsequent writing signed by both parties."  (Insertion Order ¶ 16).  Delaware follows the common law rule with respect to "no oral-modification clauses" or signed-writing clauses.[19]  The common law rule is that "an oral

---

[18] To the extent *Severn Savings* was concerned about the ambiguity of terms in an oral modification rather than whether one existed at all, it should have applied the standard in *Haft v. Dart Group Corp.*, 877 F. Supp. 896, 906 (D. Del. 1995), rather than *Reeder,* 397 A.2d 139.

[19] The common-law rule applies because this a contract for the sale of services, not goods. Therefore, Delaware Code § 2-209, derived from the Uniform Commercial Code and permitting a signed-writing requirement, does not apply.

Case No. 09-62020-CIV-ALTONAGA/Brown

agreement is sufficient to modify or rescind a written contract, notwithstanding a provision in the written contract purporting to require that subsequent modifications be evidenced by writing." WILLISTON ON CONTRACTS § 29.42 (4th ed. 1999) (citing RESTATEMENT § 149). On this point, the Supreme Court of Delaware has held:

> We think, therefore, that a written agreement between contracting parties, despite its terms, is not necessarily only to be amended by formal written agreement. We agree with Stanchifield that a written agreement does not necessarily govern all conduct between contracting parties until it is renounced in so many words. The reason for this is that the parties have a right to renounce or amend the agreement in any way they see fit and by any mode of expression they see fit. They may, by their conduct, substitute a new oral contract without a formal abrogation of the written agreement. We think the existence of Paragraphs 16 in the plaintiffs' appointments does not prohibit the modification of making of a new agreement by conduct of the parties, despite a prohibition of Paragraphs 18 against any change except by written bilateral agreement.

*Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972); *see also J.A. Moore Const. Co. v. Sussex Assocs. Ltd. P'ship*, 688 F. Supp. 982, 988 (D. Del. 1988). In this case, the modification was not oral, but appeared in writing[20] in an instant-message conversation. Nevertheless, the same principle applies to this informal, unsigned writing as to an oral modification. *See Haft*, 841 F. Supp. at 567 ("[A] written contract may be modified by agreements which themselves are not formally written."). Therefore, the instant-message conversation, as an unsigned writing, suffices under Delaware law to modify the Insertion Order despite the signed-writing clause and notwithstanding the Court's preliminary observation stated during the trial.

---

[20] Although the parties did not raise the issue, the Court has satisfied itself that neither the agreement memorialized by the Insertion Order nor the modification of the Insertion Order made during the instant-message conversation falls within Delaware's statute of frauds. *See* 6 Del. Code § 2714. In any case, the statute of frauds is an affirmative defense; it was not pleaded by the Defendant and is therefore waived. *See* FED. R. CIV. P. 8(c)(1).

Nevertheless, even if the instant-message conversation did not qualify as an enforceable modification under Delaware law and the signed-writing clause of the Insertion Order were enforceable, Smoking Everywhere would have waived the provision because, following the instant messages, CX Digital materially changed its position in reliance[21] on Touris's statements. "[W]here, following the oral modification, one of the parties materially changes position in reliance on the oral modification, the courts are in general agreement that the other party will be held to have waived or be estopped from asserting the no oral modification clause." WILLISTON § 29:42.

There is no dispute that after the September 2nd instant-message conversation between Touris and Soltani, CX Digital began to send an increased number of Sales to two new URLs. CX Digital did this because it believed Touris had agreed with Soltani to modify the Insertion Order; that is, CX Digital relied on the instant messages to change the course of its performance. (*See* Trial Tr. I at 143:15–17, 145:13–19). As discussed, Smoking Everywhere was aware of both changes and did not complain. Accordingly, Smoking Everywhere is estopped from asserting the signed-writing provision of the Insertion Order as a defense.

### c.    Consideration for the Modifications

Smoking Everywhere argues "Defendant did not give the required consideration for any modification to the initial insertion order, thus the alleged changes to the insertion order are not

---

[21] Smoking Everywhere argues that "Plaintiff has not made any type of claim for equitable relief," and therefore the parties' subsequent conduct cannot be "used towards the claim of equitable estoppels [sic]." (Def.'s Proposed Order ¶ 135). This is based on a misunderstanding. The concept of promissory estoppel as a substitute or alternative basis of enforcement antedates the recognition of a cause of action for promissory estoppel. *See, e.g., Hoffman v. Red Owl Stores, Inc.*, 133 N.W.2d 267, 275 (Wis. 1965) (citing WILLISTON 307 (1st ed.)). ("Originally the doctrine of promissory estoppel was invoked as a substitute for consideration rendering a gratuitous promise enforceable as a contract . . . . In other words, the acts of reliance by the promisee to his detriment provided a substitute for consideration."). Here, reliance is a substitute for consideration, not a cause of action.

Case No. 09-62020-CIV-ALTONAGA/Brown

enforceable."[22] (Def.'s Proposed Order ¶ 137). "Delaware courts define consideration as a benefit to a promisor or a detriment to a promisee pursuant to the promisor's request." *Cont'l Ins.*, 750 A.2d at 1232; *see also* RESTATEMENT § 75 ("[A] promise which is bargained for is consideration."). In exchange for CX Digital's promise to provide an unlimited number of Sales to Smoking Everywhere, Smoking Everywhere made an implied promise to pay for those additional Sales at the rate defined in the Insertion Order — $45 per Sale. Smoking Everywhere's implied promise to pay is the consideration for CX Digitial sending more Sales.

With respect to the agreement to switch URLs, the Court acknowledges there is no consideration for this change; however, as explained, CX Digital reasonably and foreseeably materially changed its position in reliance on that modification. "A promise modifying a duty under a contract not fully performed on either side is binding . . . to the extent that justice requires enforcement in view of material change of position in reliance on the promise." RESTATEMENT § 89. After the September 2nd instant messages, having spent much of the day working with Touris to switch the URLs and place new pixels, CX Digital began to send Sales to the new URLs. CX Digital's actions were reasonable and foreseeable in light of Touris's statements and actions during that conversation, and CX Digital's change in position was material because it had to pay its affiliates for the additional Sales. Accordingly, justice requires that Smoking Everywhere be estopped from denying that it agreed to change the target URLs.

---

[22] Smoking Everywhere actually argues that, because it did not in fact pay a $20,000 deposit in a proposed, but not signed, Insertion Order that was excluded from evidence, there was no consideration for the modification. (*See* Pl.'s Proposed Order ¶ 137). If that proposed insertion order had been adopted and Smoking Everywhere had not paid the deposit, the failure to pay would not be a failure of consideration but rather a breach of the agreement. Despite Smoking Everywhere's confusion about what "consideration" is, the Court has charitably interpreted Smoking Everywhere's argument and addressed whether there was some basis to enforce the modification.

Case No. 09-62020-CIV-ALTONAGA/Brown

### 4.    Authority of Touris to Bind Smoking Everywhere

Smoking Everywhere contends that even if Touris intended to modify the Insertion Order during the September 2nd instant-message conversation, he lacked the authority to bind Smoking Everywhere to the modification.  Under Delaware law, "[a]pparent authority may be defined as that authority which, though not actually granted, the principal knowingly or negligently [sic] permits the 'agent' to exercise or which he holds him out as possessing." *Finnegan Const. Co. v. Robino-Ladd Co.*, 354 A.2d 142, 144 (Del. Super. Ct. 1976).  "If a third party relies on the agent's apparent authority in good faith and is justified in doing so by the surrounding circumstances, the principal is bound to the same extent as if actual authority had existed." *Old Guard Ins. Co. v. Jimmy's Grille, Inc.*, 860 A.2d 811, *3 (Del. 2004) (unpublished table decision).

A number of indicia of Touris's authority to bind Smoking Everywhere were apparent to Soltani.  First, Touris was vice-president of marketing for Smoking Everywhere; it was reasonable to assume that the vice-president of marketing by virtue of his title could enter an advertising agreement on behalf of his company.  Second, Touris negotiated and signed the original Insertion Order; it was reasonable to assume that the person who signed a contract on behalf of a company had the authority to subsequently modify that agreement.  Third, with respect the URL change, Touris worked side-by-side with Soltani to change and test the new URLs and pixels; this shows that Touris either had, or thought he had, the authority to modify the agreement to change the URLs because as soon as he agreed to make the change, he personally implemented it.  Under those circumstances it would have been *unreasonable* for Soltani to conclude that Touris *did not* have the authority to modify the Insertion Order.

Case No. 09-62020-CIV-ALTONAGA/Brown

There is one wrinkle however.  Touris testified that before the Insertion Order was signed, while he was negotiating with Soltani, he told Soltani that prior to any agreement he would need to show the proposed contract to Taieb, the president of Smoking Everywhere, for his approval. (*See* Mar. 8 Trial Tr. at 6:1–3 ("[W]hen I initially in negotiated with Pedram I asked him to get me a contract so I could talk it over with Mr. Taieb and get it approved.")).  Touris also testified that while negotiating the modifications to the Insertion Order, he told Soltani "give me a contract so I can take it back to [Taieb] and discuss with [him] to see if he wants to move forward with it." (Mar. 8 Trial Tr. at 16:3–5).  If this were true, these statements may have made it unreasonable for Soltani to rely on Touris's other trappings of authority in concluding Touris could modify the Insertion Order, but the Court has grave doubts about the credibility of this testimony.

During the first four days of the trial, there was significant testimony that Touris had discussed the Insertion Order with Taieb and obtained his permission to sign it, but there was no argument or testimony from Smoking Everywhere that Touris had told Soltani he could not enter an agreement without Taieb's permission.  In fact, during his opening statement, counsel for Smoking Everywhere had the following exchange with the Court:

> MR. BLACKBURN: . . . . Nick Touris, who did some of the negotiating for [the Insertion Order], did not have the authority to contract for an assertion [sic] order of this type with these types of deals . . . .
>
> THE COURT:  What was his position with the company?
>
> MR. BLACKBURN:  I believe it's vice-president of marketing.
>
> THE COURT:  He was vice-president of marketing and he did not have the capacity to bind the company?
>
> MR. BLACKBURN:  Not in the way that the plaintiff is saying, Your Honor.

-28-

Case No. 09-62020-CIV-ALTONAGA/Brown

THE COURT:  And when did you inform the plaintiff of that?

MR. BLACKBURN:  *When we got sued*, which is shortly thereafter.

(Trial Tr. I at  39:7–40:1) (emphasis added).

It was only during his initial closing argument that Mr. Blackburn requested another day of trial to take additional testimony from Touris and Taieb.[23]  (*See* Feb. 16 Trial Tr. 44:4–9).  The Court granted this request and the trial resumed on March 8, 2011.  It was during this final day of the trial, that Touris testified for the first time — but very emphatically — that Soltani was aware Touris could not enter a contract without Taieb's permission.  (*See, e.g.*, Mar. 8 Trial Tr. at 16:3–5 ("In the end I said 'Well give me a contract so I can take it back to [Taieb] and discuss with [him] to see if he wants to move forward with it.'")).  The convenient appearance of this testimony and the comportment of the witnesses on the stand, combined with Mr. Blackburn's statement during the opening that Smoking Everywhere did not tell CX Digital that Touris lacked authority to enter contracts on its behalf until CX Digital sued them, lead the Court to conclude that as a matter of

---

[23]  During the first day of trial the Court commented, "Instant Messages and emails do not satisfy the contract's plain terms for how the parties would need to amend it.  I agree with you there."  (Trial Tr. I at 114:2–4).  However, what was not addressed was whether under Delaware law the modification might nevertheless be enforced.  (*See* Feb. 16 Trial Tr. at 39:23–40:6).  The second day of trial, Plaintiff's counsel had the following exchange with the Court:

> MR. BOESE:  And if I could say one thing, Your Honor, just for clarification. I want to be clear, I don't want Mr. Blackburn to fail to investigate any areas because of Your Honor's sort of interim ruling that the Instant Message would not successfully amend the contract.
>
> THE COURT: Very well.

(Trial Tr. II at 4:8–13).  Mr. Blackburn apparently did not hear this exchange because, during closing argument, when the Court noted that Delaware law permitted oral modifications even where a contract contained a signed-writing requirement to amend it, Mr. Blackburn expressed dismay that he was "wholly unprepared to continue this in light of . . . these new issues and the potential that . . . there now could be a modification to this contract."  (Feb. 16 Trial Tr. 35:4–9).

-29-

Case No. 09-62020-CIV-ALTONAGA/Brown

fact, Touris never told Soltani that he could not sign or modify the Insertion Order without Taieb's permission.

Nevertheless, even if it were the case that Touris told Soltani he could not enter an agreement without Taieb's permission, the record does not indicate that Touris told Soltani that he had not obtained permission to change the target URLs or to remove the limit on the number of Sales.[24]  In fact, as noted, there was a time gap between Soltani's offer to send 2,000 Sales per day and Touris's counter-offer that there be "NO LIMIT."  If it is true that Soltani was aware that Touris needed permission before he could agree to the modification, Soltani could have reasonably concluded that during that time gap Touris was obtaining any required permission from Taieb.[25]  Accordingly, Touris had the apparent authority to bind Smoking Everywhere and did so during the instant-message conversation.

---

[24] Soltani did send a second insertion order (excluded from evidence because of Defendant's abuse of discovery) to Smoking Everywhere around two weeks after the September 2nd instant messages.  (See Trial Tr. I at 49:11–14).  This second insertion order recorded the URL and Sale-volume limit changes that had been made during the instant-message conversation.  (See Trial Tr. II at 58:1–3, 58:22–25 – 59:1–3).  Smoking Everywhere argues this shows that Touris had only been negotiating during the instant-message conversation and that no final agreement on the modifications had been reached because he had not had a chance to discuss the new insertion order with Taieb.  (See Pl.'s Proposed Order ¶¶ 141–44).

This argument ignores the fact that by the time the new insertion order was sent to Smoking Everywhere, CX Digital had been sending much higher daily volumes of Sales to the new URLs, with Smoking Everywhere's knowledge, for two weeks.  If Smoking Everywhere did not believe it had modified the original Insertion Order, Touris could have objected to the increased volume to the new URLs in one of his frequent conversations with Soltani during that two-week period.  (See Trial Tr. II at 11:19–20 ("I chatted with [Soltani] almost on a daily basis.")).

[25] Of course, as discussed above, Soltani could have concluded Touris had the authority to agree to change the URLs from the fact that Touris cooperated with Soltani during the technical process to change the URLs.

-30-

Case No. 09-62020-CIV-ALTONAGA/Brown

### 5.    Frustration of Purpose and Commercial Frustration

Smoking Everywhere argues the Court should void or excuse it from performing under the modified Insertion Order because Smoking Everywhere's principal purpose was substantially frustrated by CX Digital sending too many leads to the wrong URLs. (*See* Pl.'s Proposed Order ¶¶ 199–200). There are three problems with this argument. First, the principal purpose of the contract was for customers to sign up for the Smoking Everywhere free trial. Thousands signed up, so that purpose was achieved, not frustrated. Second, both frustration of purpose and commercial frustration require the frustration to have been no fault of the defendant. *See Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 102 (3d Cir. 1986); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, No. 19875, 2005 WL 5757652, at *5 (Del. Ch. Apr. 1, 2005). Here, the additional leads were sent to the new URLs because the vice-president of marketing at Smoking Everywhere asked that they be. Therefore, Smoking Everywhere shares fault in any alleged "frustration." Third, this argument is moot because the Court has concluded that Smoking Everywhere agreed to modify the Insertion Order to permit an unlimited amount of leads to be sent to the "cxd" URLs, and that CX Digital acted in accordance with the modified agreement. Therefore, neither frustration of purpose nor commercial frustration is an available defense in this case.

### 6.    Violation of the Implied Covenant of Good Faith and Fair Dealing

Smoking Everywhere contends CX Digital breached the implied covenant of good faith and fair dealing by "act[ing] arbitrarily and unreasonably in not sending the traffic to the correct sites and sending more traffic than had been contracted." (Pl.'s Proposed Order ¶ 201). In Delaware, "an implied covenant of good faith and fair dealing inheres in every contract." *Chamison v. HealthTrust, Inc. Hosp. Co.*, 735 A. 2d 912, 920 (Del. Ch. 1999). "[A] party to a contract has made

an implied covenant to interpret and to act reasonably upon contractual language that is on its face

reasonable." *Id*. (citing *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984)).  However,

"one generally cannot base a claim for breach of the implied covenant on conduct authorized by the

terms of the agreement." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005).

Here, the conduct which Smoking Everywhere complains was done in bad faith — the sending of

an increased number of leads to new URLs — was authorized by the modified Insertion Order.

Accordingly, CX Digital engaged in authorized conduct and did not act in bad faith.

### 7.    Mutual Mistake

Smoking Everywhere suggests the Insertion Order or the modification may have been

based on a mutual mistake:

> The alleged pre-contractual representations that the parties were allegedly mistaken
> about are not contained in the agreement, but rather are expressly disclaimed and
> contradicted by the agreement as it readily available [sic] that they [sic] leads were
> sent to the wrong URLs and were sent in a volume excessive [sic] of that which was
> agreed upon.

(Pl.'s Proposed Order ¶ 202).  The seminal case involving mutual mistake concerned the sale of

a pregnant cow named Rose 2d of Aberlone.  *See Sherwood v. Walker*, 33 N.W. 919, 920 (Mich.

1887).  The defendant-sellers in *Sherwood* proved that "at the time of the alleged sale [of Rose]

it was believed by both the [buyer and the seller] that the cow was barren and would not breed."

*Id*. at 920.  The court held

> it must be considered as well settled that a party who has given an apparent consent
> to a contract of sale may refuse to execute it, or he may avoid it after it has been
> completed, if the assent was founded, or the contract made, upon the mistake of a
> material fact,— such as the subject-matter of the sale, the price, or some collateral
> fact materially inducing the agreement; and this can be done when the mistake is
> mutual.

*Id.* at 923; *see also Collins v. Burke*, 418 A.2d 999, 1002 (Del. 1980) ("The Courts of this State have always insisted in reformation cases on a showing of mutual mistake.").

The undersigned read Smoking Everywhere's argument, struggled, and ultimately failed to understand what exactly Smoking Everywhere believes both parties were mistaken about at the time they signed the Insertion Order. Smoking Everywhere observes that "[t]he number of leads upon which the invoices are based and the URL addresses to which they were supposed to be sent for tracking purposes are material," which implies that Smoking Everywhere thinks both parties were confused about where CX Affiliate traffic should go and how much should be sent. However, throughout this litigation Smoking Everywhere has maintained that both parties "agreed that they would send up to 200 leads per day to the URLs specified in the contract." (Pl.'s Proposed Order ¶ 207). Smoking Everywhere further confuses the situation by adding, "CX must have known of [discovered?] this mistake, as it attempted to change the contract and modify it to unlimited leads and change [sic] the directed URLs," (*id.* ¶ 202), and "this could even be considered a unilateral mistake, as CX is able to direct the leads to a specific URL and send too many leads, did [sic] just that" (*id.* ¶ 204). These statements do not bring the Court any closer to understanding what mistake of material fact Smoking Everywhere believes the Insertion Order was based on, and no mutual mistake is obvious from the record. Rather, in this case, it appears the parties got the cow they bargained for.

### III. DAMAGES

CX Digital is entitled to damages pursuant to the Insertion Order as modified by the September 2nd instant messages. This includes payment for up to 600 Sales per day prior to September 2, 2009, and to an unlimited number of Sales per day after September 2, 2009. CX

Case No. 09-62020-CIV-ALTONAGA/Brown

Digital through its affiliates, completed or caused to be completed 670 Sales before September 2, 2009, and 27,459 Sales during the remainder of September 2009. (*See* Agreed Trial Ex. 2). CX Digital is entitled to $45.00 for each of those Sales. This totals $30,150.00 for the 670 Sales completed prior to the modification and $1,235,655.00 for the 27,459 Sales completed after the modification. Smoking Everywhere paid a $5,000 deposit toward the balance. (*See* Trial Tr. I at 185:7–8). Therefore, Smoking Everywhere owes CX Digital $1,260,805.00.

Pursuant to the Insertion Order, CX Digital is entitled to 1.5% interest per month on the $25,150.00 August 31, 2009 invoice accruing from September 15, 2009. CX Digital is also entitled to 1.5% interest per month on the balance of $1,240,655.00 accruing from October 15, 2009. (*See* Insertion Order ¶ 3). CX Digital is also entitled to all attorney's fees and costs related to the enforcement of the Insertion Order. (*See id*. ¶ 3).

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that final judgment will be entered by separate order in favor of CX Digital Media, Inc. and against Smoking Everywhere, Inc. CX Digital is asked to submit[26] a proposed order of final judgment by March 30, 2011.

---

[26] Pursuant to the CM/ECF Administrative Procedures, proposed orders shall be filed as an attachment to a motion, notice, or other filing. The proposed document must also be e-mailed to the judge at the judge's email address. The proposed document shall be submitted by e-mail in WordPerfect or Word format. The e-mail line and the name of the attachment should include the case number, followed by a short description of the attachment (e.g., 00-cv-00000 Order).

Case No. 09-62020-CIV-ALTONAGA/Brown

**DONE AND ORDERED** in Chambers at Miami, Florida, this 23rd day of March, 2011.

CECILIA M. ALTONAGA
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

-35-